AO 106 (Rev. 01/09) Application for a Search Warrant

# United States District Court
### for the
### Western District of New York



In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address.)*

Facebook Username:
**https://www.facebook.com/#!/profile.php?id=100009046516865**

Case No. 15-MJ- 4191

## APPLICATION FOR A SEARCH WARRANT

I, BRIAN HANLEY, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the Western District of New York *(identify the person or describe the property to be searched and give its location)*:
**Facebook Username: https://www.facebook.com/#!/profile.php?id=100009046516865, as described in Attachment A.**

The above described property is believed to contain, **see Attachment B, Particular Items to be Seized, all of which constitute fruits, evidence and instrumentalities in violation of Title 18, United States Code, Section 1512.**

The basis for search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of **Title 18, United States Code, Section 1512,** and the application is based on these facts which are continued on the attached sheet:

- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

S/A BRIAN HANLEY
DRUG ENFORCEMENT ADMINISTRATION
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  December 4 , 2015

_____
*Judge's signature*

HONORABLE MARIAN W. PAYSON
UNITED STATES MAGISTRATE JUDGE
*Printed name and Title*

City and state:  Rochester, New York

## ATTACHMENT A
### Property To Be Searched

The search warrant applies to information associated with the following Facebook Username that is stored at premises owned, maintained, controlled or operated by Facebook Inc., a company headquartered in Menlo Park, California:

Facebook Username: **https://www.facebook.com/#!/profile.php?id=100009046516865**

## ATTACHMENT B
### Particular Items to be Seized

**I.**     **Information to be Disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the user ID listed in Attachment A:

a.  All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state and zip code), telephone numbers, screen names, websites, and other personal identifiers;

b.  All activity logs for the accounts and all other documents showing the user's posts and other Facebook activities;

c.  All photographs and videos uploaded by that user ID, and all photographs and videos uploaded by any user that have that user tagged in them;

d.  All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; Friend lists, including Friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook identification numbers; future and past event postings; rejected Friend requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.  All other records of communications and messages made or received by the user, including all private messages, video calling history, and pending Friend requests;

f.  All "check ins" and other location information;

g.   All IP logs, including all records of the IP addresses that logged into the account;

h.   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i.   All information about the Facebook pages that the account is or was a "fan" of;

j.   All past and present lists of Friends created by the account;

k.   All records of Facebook searches performed by the account;

l.   All information about the user's access and use of Facebook Marketplace;

m.   The types of service utilized by the user;

n.   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

o.   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

p.   All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.   <u>Information to be Seized by the Government</u>

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C.§ 1512 (witness tampering), including evidence tending to prove the identity of and relationships between any individuals conspiring to intimidate or tamper with witnesses or suspected witnesses to James Edward Sandford, III's pending charges, or any acts furthering such a conspiracy, including information pertaining to the following matters:

a.      contact or attempted contact with witnesses or suspected witnesses relating to James Edward Sandford, III's pending charges;

b.      attempts to tamper with, threaten or intimidate any witnesses or suspected witnesses relating to James Edward Sandford, III's pending charges, including Witness 1;

c.      posts or comments about witnesses or suspected witnesses relating to James Edward Sandford, III's pending charges, including the posting of statements given by witnesses or suspected witnesses;

d.      the identity of any individuals conspiring to intimidate or tamper with witnesses or suspected witnesses to James Edward Sandford, III's pending charges, including records that help reveal their whereabouts; and

e.      the identity of the person(s) who created or used the Facebook username identified in Attachment A, including records that help reveal the whereabouts of such person(s).

*15-mg -4091*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Brian Hanley, being duly sworn, depose and state the following:

### I.     INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the Drug Enforcement Administration (DEA), and as such I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21, United States Code, Section 801, et seq., and Title 18, United States Code, Section 2516(1).

2.     I have been an employee of the DEA since December of 2001 and have received sixteen weeks of specialized training in narcotics investigations at the DEA training academy located in Quantico, Virginia.  I was assigned to the Long Island District Office from December 2001 to August 2003.  I have been assigned to the Rochester, New York Resident Office since August 2003. During this time, I have participated in cases involving the distribution of cocaine, cocaine base, heroin, MDMA, marijuana, methamphetamine, Gama Hydroxy Butrate (GHB), anabolic steroids, and intimidation of witnesses.  My participation in these cases has included, but is not limited to, the monitoring and recording of court-authorized Title III interceptions; execution of search warrants; undercover operations; direction of confidential sources; and the debriefing of defendants and others involved in the distribution and consumption of illegal drugs.  I am familiar with how controlled substances are obtained, diluted, packaged, distributed, sold and used within the framework of drug trafficking in the Western District of New York. I am familiar with

digital evidence commonly possessed and used by those involved in criminal activities in all forms of media. I have also conferred with other Special Agents who have experience in cyber investigations and digital evidence.

3.     In addition to investigating the trafficking of controlled substances, I have also received training and participated in investigations involving importation and distribution of synthetic controlled substances and controlled substance analogues, sometimes referred to as "designer drugs." The Analogue Enforcement Act, Title 21, United States Code, Section 813, imposes criminal liability through the more general provisions of the Controlled Substances Act, Title 21, United States Code, Section 841(a). Pursuant to Title 21, United States Code, Section 813, "a controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in Schedule I."

4.     The term "controlled substance analogue" means a substance which: (1) has a chemical structure that is substantially similar to the chemical structure of a controlled substance in schedule I or II; and (2) has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or (3) has been represented or intended by a particular person to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II. See, Title 21, United States Code, Section 802(32)(A).

2

5.      Synthetic designer drugs and controlled substance analogues have often been referred to generically as "bath salts" or "molly," or in the case of cannabis-type substances, "spice," "fake" or "incense."  I am aware that the chemicals are often marketed as having innocent uses, such as "potpourri," "incense," "research chemicals," "glass cleaner," or "plant food/fertilizer."  I am also aware that distributors of synthetic designer drugs and controlled substance analogues will falsely label them as "Not for Human Consumption" in an attempt to avoid criminal liability, even though human consumption is precisely the intent of the distributor and purchaser.

6.      Synthetic designer drugs and controlled substance analogue substances, like their natural counterparts, are highly dangerous chemicals that are ingested by drug users. They are generally used as a substitute for other, more familiar, controlled substances such as marijuana, MDMA (ecstasy), cocaine, ketamine, PCP, and methamphetamine.  I am aware that certain analogues can be ingested orally, smoked, or put into a solution and injected into veins.  People who abuse these substances have reported agitation, insomnia, irritability, dizziness, depression, paranoia, delusions, suicidal thoughts, seizures, and panic attacks.  Users have also reported impaired perception of reality, reduced motor control, and decreased ability to think clearly.

7.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a social networking company with headquarters in Menlo Park, California.  The information to be searched is described in the following paragraphs and Attachment A.  I make this affidavit in support of the application for a search warrant under 18 U.S.C. 2703(a), 2703(b)(1)(A), and

3

2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber(s) or customers(s) associated with the following username:

**Username: https://www.facebook.com/#!/profile.php?id=100009046516865**

(hereinafter Subject Facebook Account).

Based on my training and experience, and the facts set forth in this affidavit, there is probable cause to believe that the Subject Facebook Account contains evidence of the crime of witness tampering, a violation of Title 18, United States Code, Section 1512.

8.     I am familiar with the facts contained in this affidavit based upon my personal involvement in this investigation, information provided by other law enforcement agents, information from public databases, and my review of conversations between defendants and witnesses regarding drug distribution, witnesses testifying, and cooperating with law enforcement in the prosecution of defendants in this case.   Because this affidavit is submitted for the limited purpose of obtaining search warrants, I have not included each and every fact known to me concerning this investigation.   I have set forth facts that I believe are necessary to establish probable cause to search the above referenced Facebook account.

## FACEBOOK

9.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written

news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

10.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.   This information may include the user's full name, birth date, gender, contact email addresses, Facebook passwords, Facebook security questions (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.   Facebook also assigns a user identification number ("user ID") to each account.   A Facebook user can also establish a "vanity name" for the Uniform Resource Locator (URL) for their Facebook page.

11.     Facebook users can select different levels of privacy for the communication of information associated with their Facebook accounts.   By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.   Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

12.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.   A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view

information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "Mini-Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

13.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.   Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

14.     Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, a user's "Photo print" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tag in them.

15.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other

users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

16.   Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, Live Journal, and Blogger.

17.   The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

18.   Facebook also has a Marketplace feature, which allows users to post free classified ads.   Users can post items for sale, housing, jobs, and other items on the Marketplace.

19.   In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

20.   Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; Mini-Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is

a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

21.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

22.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

23.     Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning

subscribers and their use of Facebook, such as account access information, transaction information, and account application.

## II.    PROBABLE CAUSE

### Vehicle Stop and Arrest of SANDFORD

24.    On March 24, 2015, Penn Yan Police Department Investigator Thomas Dunham observed SANDFORD stopped at a gasoline pump of the Byrne Dairy in the driver's seat of a green-colored Cadillac, bearing New York license plate number GLR2880. Investigator Dunham also observed three other individuals with SANDFORD; the other individuals in the vehicle were identified as Philip White, Matthew BRUNO, and Aaron Vermilye.  A check with the New York State Department of Motor Vehicles revealed that New York license plate number GLR2880 is registered to James E. Sandford, the father of SANDFORD, for a green-colored Cadillac Deville.   Investigator Dunham had prior knowledge that SANDFORD's driver's license had been suspended.  Investigator Dunham then observed SANDFORD driving through the parking lot towards the rear of the Byrne Dairy and initiated a traffic stop.

25.    Investigator Dunham handcuffed SANDFORD and, in searching him incident to arrest, located a large sum of money in his wallet and pants pocket.  Investigator Dunham also located a bag labeled "Jamaican Gold Super Extreme Pot Potpourri" in SANDFORD's pants pocket.  SANDFORD was then placed in the back of a patrol vehicle. The other individuals in the vehicle were identified as Philip White, Matthew BRUNO, and Aaron Vermilye.  White told Investigator Dunham that SANDFORD had picked him up while he was walking. Vermyle and BRUNO both stated that they met SANDFORD in the

Byrne Dairy parking lot.  SANDFORD was transported the Penn Yan Police Department and his vehicle was impounded and towed to the Penn Yan Police Department impound lot.

      26.    An inventory search of SANDFORD'S vehicle was conducted by members of the Penn Yan Police Department and the following items of evidence were seized:

    A.    six (6) bags of suspected synthetic cannabinoids seized from between the front driver's seat;

    B.    micro zip lock baggie with brown residue seized from under the passenger front seat;

    C.    one (1) LG Tracfone, bearing serial number 412CQUK2128046, seized from the front driver's seat;

    D.    eight (8) strips of Suboxone seized from a men's leather coat pocket located in the trunk of the vehicle;

    E.    $2,316 in United States Currency seized from the person of SANDFORD and the glove box of the vehicle;

    F.    rolling papers seized from inside the front console;

    G.    two (2) bags containing 68 bags of suspected synthetic cannabinoids seized from the trunk;

    H.    a digital scale seized from the trunk;

    I.    a MasterCard debit card and temporary Zoto's Factory identification card belonging to Robert Pierce seized from the trunk;

    J.    nine (9) empty bags of suspected synthetic cannabinoids seized from the trunk;

    K.    three (3) cellular telephones seized from the trunk;

    L.    an HP 2000 laptop computer, bearing serial number FCC ID PPDAR5B125, seized from the trunk;

    M.    a Kindle tablet in a black case seized from the trunk;

N.   an Olympus digital camera, bearing serial number JEH253456, seized from the trunk; and

O.   miscellaneous fireworks and a Samson Go-mic portable USB seized from the trunk.

27.   The 75 full bags of suspected synthetic cannabinoids were transferred to the DEA Northeast Regional Laboratory for analysis.   Analysis by DEA Senior Forensic Chemist Maureen Craig revealed that in a sampling of the suspected synthetic cannabinoids recovered from the vehicle, the following substances were identified in the exhibit:

A.   1.01 (16 bags labeled "Geeked Up") - AB-FUBINACA and AB-CHMINACA confirmed in the 12 bags tested;

B.   1.02 (13 bags labeled "Caution") - XLR11 confirmed in the 10 bags tested;

C.   1.03 (2 bags labeled "Pineapple" and 1 bag labeled "Black") - AB-FUBINACA confirmed in all 3 bags;

D.   1.04 (1 bag labeled "Brandy") - AB-FUBINACA and XLR11;

E.   1.05 (12 bags labeled "Jamaican" and 22 bags labeled "Kisha") - NM2201 confirmed in the 18 bags tested;

F.   1.06 (1 bag labeled "Psycho") - AB-CHMINACA and XLR11;

G.   1.07 (1 bag labeled "Psycho") - AB-CHMINACA ;

H.   1.08 (4 bags labeled "Psycho") - AB-FUBINACA and AB-CHMINACA confirmed in all 4 bags;

I.   1.09 (1 bag labeled "Psycho") - AB-FUBINACA, AB-CHMINACA, and XLR11; and

J.   1.10 (1 bag labeled "Black") - AB-FUBINACA and XLR11.

28.   AB-CHMINACA, AB-FUBINACA and XLR11 are synthetic cannabinoids and Schedule I Controlled Substances.   DEA utilized its emergency scheduling authority to

control these three synthetic drugs.  XLR11 was emergency scheduled on May 16, 2013, AB-FUBINACA was emergency scheduled on February 10, 2014, and AB-CHMINACA was emergency scheduled on January 3, 2015.  Chemical and pharmacological experts at the DEA's Special Testing Laboratory determined that "NM2201" qualifies as a "controlled substance analogue" under Title 21 of the Controlled Substances Act, meaning that it is a man-made designer drug that resembles a Schedule I or II controlled substance both in molecular or chemical structure and is expected to have substantially similar, actual or purported pharmacological effect.  NM2201 is an analogue of the Schedule I Controlled Substance 5F-PB-22.

### Statement of Witness 1

29.     On March 26, 2015, Investigator Dunham interviewed Witness 1 in connection with an investigation of James SANDFORD concerning SANDFORD's distribution of synthetic cannabinoids to a minor in exchange for a stolen firearm.  On that same date, Witness 1 provided a written statement to Investigator Dunham concerning Witness 1's observations in connection with that investigation.

### Sandford's Federal Charges

30.     On June 4, 2015, the Honorable Marian W. Payson, United States Magistrate Judge, Western District of New York, issued a criminal complaint (15-MJ-4090) charging SANDFORD with distribution, and possession with intent to distribute, of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), possession of a firearm by a convicted felon, in violation of Title 18, United States Code, Section 922(g)(1),

and receipt of a stolen firearm, in violation of Title 18, United States Code, Section 922(j). Shortly thereafter, SANDFORD was arrested by members of the DEA Rochester Resident Office for the aforementioned charges.

31.    On or about July 14, 2015, a federal grand jury issued a 12-count Indictment (15-CR-6101), charging SANDFORD with conspiracy to possess with intent to distribute, and to distribute, controlled substances and a controlled substance analogue, in violation of Title 21, United States Code, Section 846; distribution of controlled substances and a controlled substance analogue within 1,000 feet of a school, in violation of Title 21, United States Code, Section 860(a) and Title 18, United States Code, Section 2; two counts of possession with intent to distribute, and distribution, of controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); one count of distribution of a controlled substance to a person under age 21, in violation of Title 21, United States Code, Section 859(a); possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i); four counts of possession of controlled substances with intent to distribute, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C);  felon in possession of a firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2); and possession of a stolen firearm, in violation of Title 18, United States Code, Sections 922(j), 924(a)(2), and 2.

## Facebook Messages and Photos

32.    In September of 2015, Yates County Sheriff's Investigator Arlyn Cunningham reviewed the Subject Facebook Account, which law enforcement believes, is utilized by Matthew BRUNO, a known associate of SANDFORD who was with SANDFORD on

March 24, 2015 when SANDFORD was arrested.  This belief is based upon conversation

with one or more individuals familiar with BRUNO who are "friends" with BRUNO on

Facebook, as well as the profile photograph for the Subject Facebook Account, which is a

photograph of Matthew BRUNO.  Additionally, "Matt Bruno" is the name on the profile.


33.     In September 2015, Investigator Cunningham observed a post on the Subject

Facebook Account dated September 16, 2015, at 5:00 PM that contained a photograph of a

written voluntary statement given by Witness 1 to members of the Penn Yan Police

Department in connection with the investigation of SANDFORD.  The post was posted by

the user of the Subject Facebook Account.  The photograph of Witness 1's statement was

posted in a public domain on the Subject Facebook Account page, which allows everyone in

the general public to observe it, duplicate it, and re-distribute it.  Along with the photograph

of the statement from Witness 1 about SANDFORD, the user of the Subject Facebook

Account posted:  "And he say he not a snitch lmao. But said the kid probably traded the gun

for drugs in the house haha. #stopsnitching #freemalliz."  Your affiant knows "lmao" to

represent an abbreviated for "laugh my ass off."  Your affiant also knows SANDFORD to

go by the name "MALLIZ" in FACEBOOK posts and recorded conversations.


34.     Other FACEBOOK users "liked" this post of the Subject Facebook Account

and posed comments.   Witness 1's name was visible in the photograph posted on the

Subject Facebook Account and on that same date, September 16, 2015 at 8:26 PM, the user

of the Subject Facebook Account posted a comment stating that the statement was from

Witness 1. After reviewing this post, Investigator Cunningham then printed out these public domain FACEBOOK pages for evidentiary purposes.

35.     Shortly thereafter, Investigator Cunningham showed Investigator Dunham the FACEBOOK page. Investigator Dunham was able to verify that the post on the Subject Facebook Account was in fact a photograph of the statement given by Witness 1 to Investigator Dunham on March 26, 2015. The name of Witness 1 and the statement given by Witness 1 was clearly visible in the photograph posted on BRUNO's FACEBOOK page. Your affiant knows that individuals commonly post messages and photographs on public domain in order to have them viewed, shared, and distributed among many communities of people in a short period of time.

36.     On October 14, 2015, your affiant interviewed BRUNO at the Yates County Jail in connection with the posts of Witness 1's statements on the Subject Facebook Account. BRUNO explained that he did post Witness 1's statement to the Subject Facebook Account, but stated that when he found out that it was illegal to so, he had his family take it down. BRUNO refused to answer any more questions regarding the posting.

37.     On October 15, 2015, a preservation letter was sent to Facebook for the Subject Facebook Account. Based upon conversation with other experienced DEA agents, I am aware that Facebook maintains records of deleted posts for a period of time and believe that the deleted posts from the Subject Facebook Account may still be available in the Facebook records for the Subject Facebook Account.

### III.   INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

38.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Attachment B.

### CONCLUSION

39.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of Facebook there exists evidence of a crime, and contraband and fruits of a crime. Accordingly, a search warrant is requested.

40.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) and (c)(1)(A).  Specifically, the Court is a "district court of the United States (including a magistrate judge of such a court)… that - has jurisdiction over the offense being investigated," that is, witness tampering, a violation of Title 18, United States Code, Section 1512.

16

Dated: Rochester, New York, December 4 , 2015.

BRIAN HANLEY
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me
this 4 day of December, 2015.

HONORABLE MARIAN W. PAYSON
UNITED STATES MAGISTRATE JUDGE

17

## ATTACHMENT A
### Property To Be Searched

The search warrant applies to information associated with the following Facebook Username that is stored at premises owned, maintained, controlled or operated by Facebook Inc., a company headquartered in Menlo Park, California:

Facebook Username: **https://www.facebook.com/#!/profile.php?id=100009046516865**

**ATTACHMENT B**
**Particular Items to be Seized**

I.     **Information to be Disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for the user ID listed in Attachment A:

a.   All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state and zip code), telephone numbers, screen names, websites, and other personal identifiers;

b.   All activity logs for the accounts and all other documents showing the user's posts and other Facebook activities;

c.   All photographs and videos uploaded by that user ID, and all photographs and videos uploaded by any user that have that user tagged in them;

d.  All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; Friend lists, including Friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook identification numbers; future and past event postings; rejected Friend requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.   All other records of communications and messages made or received by the user, including all private messages, video calling history, and pending Friend requests;

f.   All "check ins" and other location information;

g.   All IP logs, including all records of the IP addresses that logged into the account;

h.   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i.   All information about the Facebook pages that the account is or was a "fan" of;

j.   All past and present lists of Friends created by the account;

k.   All records of Facebook searches performed by the account;

l.   All information about the user's access and use of Facebook Marketplace;

m.   The types of service utilized by the user;

n.   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

o.   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account; and

p.   All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.   __Information to be Seized by the Government__

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1512 (witness tampering), including evidence tending to prove the identity of and relationships between any individuals conspiring to intimidate or tamper with witnesses or suspected witnesses to James Edward Sandford, III's pending charges, or any acts furthering such a conspiracy, including information pertaining to the following matters:

a.      contact or attempted contact with witnesses or suspected witnesses relating to James Edward Sandford, III's pending charges;

b.      attempts to tamper with, threaten or intimidate any witnesses or suspected witnesses relating to James Edward Sandford, III's pending charges, including Witness 1;

c.      posts or comments about witnesses or suspected witnesses relating to James Edward Sandford, III's pending charges, including the posting of statements given by witnesses or suspected witnesses;

d.      the identity of any individuals conspiring to intimidate or tamper with witnesses or suspected witnesses to James Edward Sandford, III's pending charges, including records that help reveal their whereabouts; and

e.      the identity of the person(s) who created or used the Facebook username identified in Attachment A, including records that help reveal the whereabouts of such person(s).